[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13352
Non-Argument Calendar
_____

D.C. Docket No. 0:17-cr-60001-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GUY ST. AMOUR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 29, 2018)

Before TJOFLAT, MARTIN, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Guy St. Amour appeals his conviction for operating an aircraft with an unapproved fuel system in violation of 49 U.S.C. § 46306(b)(9). He argues that the term "operates an aircraft" covers actions during or imminent to flight. Therefore, he contends, the term does not reach his taxiing and refueling of an aircraft in preparation for a flight on the following day. We disagree. As defined in both the United States Code and the Code of Federal Regulations—and clarified through the decisions of the Civil Aeronautics Board ("CAB") and the National Transportation Safety Board ("NTSB")—the term "operate" encompasses the refueling of an aircraft for the purpose of flight.

I.

A.

St. Amour became licensed as a pilot in 1999 and since then has occasionally worked as a "ferry pilot," which means that he facilitates the sale of aircraft by flying them to the locations of purchasers. Javier and Rolando Peyrat, two Paraguayans, retained St. Amour's services as a ferry pilot sometime in late 2012 or early 2013. They hired him to fly a Cessna 182 single-engine aircraft, registration number N3482F, from the Ft. Lauderdale Executive Airport ("FXE")

2

in Florida to Asunción, Paraguay—a city in the heart of South America.[1]  In preparation for this journey of nearly 4,000 miles, St. Amour sought to outfit N3482F with an auxiliary fuel system of his own design.

The auxiliary fuel system consisted of a plastic, maritime fuel tank secured with a ratchet strap to the back seat of the aircraft.  From the plastic tank ran a clear hose that exited the aircraft through a fitting in the fuselage.  The hose ran up the wing and into the fuel tank of the aircraft.  It was secured to the wing with duct tape.  Inside the cabin, an electric pump pushed fuel from the plastic tank, through the hose, and into the aircraft's fuel tank.  The pump was powered by a cigarette lighter in the cockpit.

St. Amour hired a mechanic at FXE named Raphael Garzon to install this auxiliary fuel system.  Garzon, however, failed to complete the installation because he could not install a modified fuel cap in one of the wings, which prevented the fuel line from the plastic tank from being fed into the aircraft's tank.  St. Amour thus hired another mechanic named Patricio Farias to finish the job.

On March 27, 2013, St. Amour taxied N3482F to Farias' hangar at FXE. Farias completed the installation of the fuel system in a few hours for $100.  With the installation complete, St. Amour started the aircraft's engine and taxied to a maintenance facility for refueling.  Later that day, agents of the Drug Enforcement

---

[1] We presume that St. Amour intended to break this trip into a number of legs, since the single-engine Cessna, even modified, does not have a range of 4,000 miles.

Agency ("DEA") apprehended St. Amour in front of the maintenance facility on suspicion of drug trafficking.[2]

During an interview with DEA agents, St. Amour said that he had planned to depart in N3482F for Paraguay between 10 a.m. and 11 a.m. the following day, March 28.[3]  While the DEA agents neither discovered drugs nor arrested St. Amour, the situation was referred to the Department of Transportation ("DOT"). Much later, in an interview with DOT agents, St. Amour again stated that he had planned to leave for Paraguay the following day and would have but for the intervention of the DEA.

## B.

On January 6, 2017, a one-count indictment was filed against St. Amour for operating an aircraft with knowledge that the auxiliary fuel system did not comply

---

[2] The DEA received a tip from a confidential source that a suspicious aircraft was parked outside the maintenance facility and about to depart.

[3] The transcript of the conversation between St. Amour and the DEA agents reads as follows:

| | |
|---|---|
| SA PETRASEK | Yeah, when is the aircraft scheduled to leave? |
| ST. AMOUR | I'm supposed to leave tomorrow. |
| SA PETRASEK | Tomorrow? |
| ST. AMOUR | Yeah. |
| SA PETRASEK | What time tomorrow? |
| ST. AMOUR | Uh, tomorrow between ten, eleven. |
| SA PETRASEK | Ten, eleven? |
| ST. AMOUR | Yeah. |
| SA KEENAN | Is it flight ready, operational now? |
| SA PETRASEK | Is it flight ready and operational now? |
| ST. AMOUR | Flight ready? |
| SA PETRASEK | Yeah.  Is it ready to fly? |
| ST. AMOUR | Yes, it can fly. |

4

with the regulations and requirements of the Federal Aviation Administration ("FAA"). *See* 49 U.S.C. § 46306(b)(9). He was arrested on February 22, 2017.

In May 2017, St. Amour moved to dismiss the indictment as a matter of law.[4] St. Amour argued that he had not operated N3482F within the meaning of 49 U.S.C. § 46306(b)(9) because the word "operate" in that provision refers only to conduct during or imminent to flight. Based on this construction, St. Amour contended that he did not operate the aircraft because he neither flew nor intended to fly N3482F on March 27; he taxied and fueled the aircraft for a flight the next day. Therefore, in effect, St. Amour advocated for a definition of "operate" that requires a strict "temporal proximity" between the conduct and flight.[5]

The Government disagreed. It argued that the term "operate" reaches the use of an aircraft to prepare for flight, regardless of when that flight is scheduled. In the Government's view, the use of an aircraft in preparation for or incident to flight constitutes "operation" of that aircraft. To support this interpretation, the

---

[4] St. Amour also moved on May 26 to dismiss the indictment because of an alleged violation of the Speedy Trial Act, 18 U.S.C. § 3161(b). We need not discuss this motion since it is not before us.

[5] In a hearing on the motion to dismiss, counsel for St. Amour stated that the term "operates an aircraft" contemplates that "there's going to be a flight" that is "part of the same transaction or occurrence" as the act of operation. He argued that "[o]nce the sequence of events leading up to that plane going airborne are interrupted, it stops there. Then you have to look at the next series of events." However, when questioned as to whether St. Amour's actions were "preparatory to the flight the following day," St. Amour's counsel responded, "Right and absolutely."

Government pointed out that the safety hazards posed by an unauthorized fuel system exist both in the air and on the ground.

In an order on June 19, 2017, the District Court denied the motion to dismiss the indictment. Before addressing St. Amour's arguments, the District Court noted that "the parties have stipulated to the facts and waived any procedural bar to a merits determination at this stage."[6] The District Court then moved to the merits.

---

[6] The parties proffered the following facts as established for purposes of the motion to dismiss.

On March 27, 2013, agents of the Drug Enforcement Administration ("DEA") received information from a confidential source ("CS") that a 1966 Cessna 1821 aircraft, bearing U.S. registration N3482F (the "Cessna"), was preparing to depart Ft. Lauderdale, Florida Executive Airport ("FXE") with a modification to its fuel system. Agents located the Cessna in front of the World Jet Inc. hangars at FXE and observed, through the windows of the aircraft, a large, plastic marine fuel tank in the back seat held in place with a ratchet strap. A clear hose ran up the wing, attached by duct tape, to the actual fuel tank of the plane. A pump inside the plane, powered by the plane's cigarette lighter, was supposed to pump fuel from the large plastic tank[.]

On March 25, 2015, agents from the Department of Transportation interviewed Defendant a second time. After waiving his *Miranda* rights, he provided a sworn affidavit admitting that he was aware of the need to obtain FAA approval prior to operating an aircraft with fuel modifications such as the one done per his request to the Cessna on March 27, 2013, but had not sought or secured such FAA approval. Defendant admitted that the purpose of making the fuel system modification was to "extend the range" of the Cessna because he was going to take the Cessna to South America. In addition, Defendant's sworn affidavit stated:

> I hired a gentleman Patrick who drilled into the wing cap and the tubes and someone else name[d] Raphael installed the marine gas tank in the cabin rear seat. Once that was done, I taxied the plane to world jet where I got fuel for the plane. I never flew the airplane to South America because the D.E.A. showed up to question about the airplane. I was scheduled to fly the plane to Ascuncion [sic] Paraguay the next day for the owner.

6

It held that the term "operate" is "clearly broader than the more specific concept of 'flying' an aircraft" and that "obtain[ing] fuel for a flight scheduled for the next day constitute[s] 'operation' of an aircraft." In reaching this result, the District Court found the Ninth Circuit's decision in *Daily v. Bond*, 623 F.2d 624 (9th Cir. 1980) (per curiam), "particularly persuasive because it supports the proposition that [St. Amour's] 'operation' of the aircraft was 'for the purpose of air navigation' because it [was] preparatory to flight." The District Court declined to define "exactly how close in time the operation of an aircraft must be in relation to air navigation to constitute a violation of 49 U.S.C. § 46306(b)(9)," but determined that St. Amour's refueling of the aircraft was "sufficiently connected" to the flight scheduled for the following day.

After the denial of his motion to dismiss, St. Amour entered a guilty plea but reserved his right to appeal the denial of his motion to dismiss.[7] On July 24, 2017, St. Amour filed a notice of appeal challenging the denial of his motion to dismiss. The same as before, St. Amour argues that the term "operate" is ambiguous as defined in the United States Code and the Code of Federal Regulations and should receive a narrow construction that covers conduct during or imminent to flight.

---

On March 27, 2013, the Cessna was not being used to provide air transportation as that term is used in Title 49, United States Code, Section 46306. On that date, Defendant was aware that the fuel system of the Cessna had been modified without prior approval from the FAA.

[7] St. Amour was sentenced to a year of probation and a $100 fine.

II.

A.

We review a district court's denial of a motion to dismiss an indictment under the abuse-of-discretion standard. *United States v. Seher*, 562 F.3d 1344, 1356 (11th Cir. 2009). However, questions of statutory interpretation are reviewed *de novo*. *United States v. Segarra*, 582 F.3d 1269, 1271 (11th Cir. 2009).

The interpretation of a statute begins with its language. *Watt v. Alaska*, 451 U.S. 259, 265, 101 S. Ct. 1673, 1677 (1981). Our first task "is to determine whether the language at issue has a plain and unambiguous meaning with regard to a particular dispute." *United States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2002) (quotation omitted). If so, we need go no further. *Id.* at 1338. In reading a statute, we construe it as a whole and avoid "look[ing] at one word or term in isolation." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).

This case concerns the meaning of the term "operates an aircraft" in 49 U.S.C. § 46306(b)(9). That provision states as follows:

> [A] person shall be fined under title 18, imprisoned for not more than 3 years, or both, if the person . . . *operates an aircraft* with a fuel tank or fuel system that has been installed or modified knowing that the tank, system, installation, or modification does not comply with regulations and requirements of the Administrator of the Federal Aviation Administration.

8

*Id.* (emphasis added).  The United State Code and Code of Federal Regulations both define "operate" with respect to aircraft.[8]  In the United States Code, the terms "operate aircraft" and "operation of aircraft" are defined as "using aircraft for the purposes of air navigation, including . . . the navigation of aircraft . . . and causing or authorizing the operation of the aircraft with or without the right of legal control of the aircraft."  49 U.S.C. § 40102(a)(35).  Similarly, the Code of Federal Regulation states: "Operate, with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose . . . of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise)."  14 C.F.R. § 1.1.  Thus, as defined, the term "operates an aircraft" in 49 U.S.C. § 46306(b)(9) necessarily encompasses more than the piloting of an aircraft in flight.  It broadly embraces any use of an aircraft for the *purpose* of air navigation, including flight itself and actions that are preparatory or incident to flight.

The breadth of this definition makes sense given the policies underlying 49 U.S.C. § 46306(b)(9).  *See United States v. Haun*, 494 F.3d 1006, 1009 (11th Cir. 2007) ("The court should adopt that sense of the words which bests harmonizes with the context, and promotes in the fullest manner the policy and objects of the legislature." (quotation omitted)).  Among other goals, the federal aviation

---

[8] These definitions govern the term "operate" as used throughout the portion of the United States Code dealing with air commerce and safety, including 49 U.S.C. § 46306.

legislation aims at "assigning, maintaining, and enhancing safety and security as the highest priorities in air commerce." 49 U.S.C. § 40101(d)(1). The Administrator of the FAA is thus directed to "promote safe flight of civil aircraft in air commerce by prescribing . . . minimum standards required in the interest in safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers." *Id.* § 44701(a)(1). The prohibition against installing unapproved fuel systems or making non-compliant modifications furthers this goal of safety. An unapproved fuel system raises safety concerns regardless of whether an aircraft is in the air or on the ground because, after all, an explosion or fire may reap devastation in either location. Moreover, if defined narrowly to only cover conduct during or imminent to flight, law enforcement would in many cases be unable to stop an aircraft with an illegal fuel system from taking flight, nullifying the preventative value of the criminal provision. It thus makes good sense that the term "operates an aircraft" in 49 U.S.C. § 46306(b)(9) reaches any use of an aircraft for the *purpose* of flight.

A long line of administrative decisions confirms that "operates an aircraft" covers uses of an aircraft that are preparatory or incident to the flight of that aircraft. The NTSB and its predecessor, the CAB, have long held that the word

10

"operate" means using an aircraft preparatory or incident to flight.[9]  The CAB first

ruled on this matter in *Administrator v. Ruhland*, where it held that a person who

started an aircraft's engine in a maintenance hangar had not operated the aircraft

because he started the engine by accident.  26 C.A.B. 799, 799 (1957).  Since the

person acted without intent to fly the aircraft, his actions "were not incident to the

flight of an aircraft and, accordingly, did not constitute 'operating' an aircraft."  *Id.*

In *Administrator v. Hise*, the CAB considered whether a person was operating an

aircraft when he taxied to a tie-down area and stopped the aircraft, but kept the

engine running.  38 C.A.B. 1237, 1237 (1963).  Because these actions were

"directly and necessarily connected with the flight," the CAB concluded that they

were "incident to the flight of an aircraft."  *Id.* at 1238 (quoting *Ruhland*, 26

C.A.B. at 799).

Years later, after Congress replaced the CAB with the NTSB, the NTSB

decided *Administrator v. Pauly*, which raised the question whether a person

operated an aircraft by attempting to start it with a jumper cable attached to a car.

2 N.T.S.B. 1369, 1369–71 (1975).  In that case, after the aircraft started, it leapt

forward and hit the car, causing property damage and injuring a nearby patrolman.

*Id.* at 1371.  It was "apparent" that the person attempted to start the aircraft with

---

[9] *See Administrator v. Dailey*, 3 N.T.S.B. 1319, 1319–21 (1978); *Administrator v. Collins*, 2 N.T.S.B. 1494, 1495–96 (1975); *Administrator v. Pauly*, 2 N.T.S.B. 1369, 1370 (1975); *Administrator v. Hise*, 38 C.A.B. 1237, 1237–38 (1963); *Administrator v. Kozloff*, 27 C.A.B. 1169, 1169–1171 (1958); *Administrator v. Ruhland*, 26 C.A.B. 799, 799 (1957).

the intent to depart the airport. *Id.* at 1370. Staying true to the precedent of the CAB, the NTSB held that the attempted start constituted operation of the aircraft because it was "preparatory to flight." *Id.* at 1370. In another case, *Administrator v. Collins*, the NTSB held that the taxiing of an aircraft after landing constituted operation of the aircraft. 2 N.T.S.B. 1494, 1495–96 (1975). It reasoned that such taxiing "was 'incident to the flight of an aircraft,' in that it was 'action directly and necessarily connected with the flight.'" *Id.* (quoting *Hise*, 38 C.A.B. at 1238).

Lastly, in *Dailey*, a pilot named Dailey attempted to start an aircraft for a flight, even though the aircraft was under maintenance. 3 N.T.S.B. 1319, 1319–20 (1978). An engine immediately caught fire, forcing Dailey to abort the start and abandon the aircraft. *Id.* at 1319. The aircraft itself never moved. *Id.* Distinguishing *Pauly* on the facts, an administrative law judge held that Dailey had not "operated" the aircraft because it did not move. *Id.* On appeal, the NTSB reversed this decision and held that Dailey operated the aircraft because to hold otherwise would conflict with precedent and defeat the purpose of the regulatory provision at issue. *Id.* at 1320.

Dailey appealed the NTSB decision to the Ninth Circuit. *See Daily*, 623 F.2d at 625–626. Dailey argued that the starting of the plane was not incident to flight because the aircraft never moved and "a final decision to fly the plane would not have been made until the aircraft was at the end of the runway." *Id.* at 626.

12

The Ninth Circuit did not find Dailey's distinctions "to be meaningful" and held that "since the attempted start was preparatory to flight, it was for the purpose of air navigation and thus constituted operation of the aircraft." *Id.* (quoting *Pauly*, 2 N.T.S.B. at 1370). It thus affirmed the decision of the NTSB.

Therefore, the statutory and regulatory definitions, the objective of safety in air commerce, and the administrative decisions are all in agreement. A person operates an aircraft when he uses it for the purpose of air navigation, which includes flight itself and actions that are preparatory or incident to flight. *See* 49 U.S.C. § 40102(a)(35); 14 C.F.R. § 1.1. The term "operates an aircraft" therefore covers the use of an aircraft on the ground—including the starting, taxiing, or parking of an aircraft—so long as the use was preparatory or incident to flight.

As defined, we disagree that the term "operates an aircraft" requires a strict temporal relationship between the use of an aircraft and flight. The statutory and regulatory definitions make clear that whether a person has operated an aircraft depends on the *purpose* for which the person used the aircraft. *See* 49 U.S.C. § 40102(a)(35), 14 C.F.R. § 1.1. The definitions do not speak in terms of time; they speak only of purpose. Accordingly, when a person uses an aircraft with the intent for flight, he has operated that aircraft.

13

B.

The present case falls within the scope of the term "operates an aircraft." St. Amour started the engine of N3482F and taxied to a maintenance hangar where he refueled the aircraft to prepare for a flight the next day. Needless to say, an aircraft cannot fly without fuel; it is a necessary precondition for flight.[10] Therefore, St. Amour operated the aircraft within the meaning of 49 U.S.C. § 46306(b)(9) when he started, taxied, and fueled N3482F in preparation for the first of his flights on the voyage to Paraguay.[11] It does not matter that he did not intend to fly N3482F

---

[10] In a hearing before the District Court, defense counsel admitted that St. Amour's actions were "preparatory to the flight the following day." Moreover, the District Court asked St. Amour's counsel: "Well, why was the plane fueled?" Counsel responded: "Well, to fly at some point a hundred percent. I mean, I don't think you're going to fuel it just to fuel it. You're going to fly it." This makes clear that St. Amour fueled the aircraft for the purposes of flight, not some other purpose.

[11] St. Amour argues that the term "operates an aircraft" creates ambiguity sufficient to trigger the rule of lenity or, if not, to raise a question of unconstitutional vagueness. The rule of lenity is a canon of statutory construction that "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Svete*, 556 F.3d 1157, 1169 (11th Cir. 2009) (quotation omitted). It applies when a grievous ambiguity in the statute allows no more than a guess as to what Congress intended. *Muscarello v. United States*, 524 U.S. 125, 138–39, 118 S. Ct. 1911, 1919 (1998). Here, the rule of lenity does not require an acquittal of St. Amour because the term "operates an aircraft" does not create the grievous ambiguity necessary to trigger the rule. By defining "operate" as any use of an aircraft for the purpose of air navigation, including the piloting of aircraft, the statutory and regulatory definitions puts individuals on notice that the word "operate" sweeps more broadly than flight or actions imminent to flight. The rule of lenity has no application to this case.

St. Amour argues that due process forbids interpreting 49 U.S.C. § 46306(b)(9) to proscribe conduct which he could not have foreseen within its scope. His problem is that the statute is not ambiguous. *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997) ("[T]he vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." (quotation omitted)). Section 46306(b)(9) forbids a person from operating an aircraft with an unapproved fuel tank, where "operate" is defined to

14

on March 27 because his use of the aircraft prepared the way for flight on March

28.

      **AFFIRMED.**

---

mean using an aircraft for the purpose of air navigation—including but not limited to piloting an aircraft.  A person of common intelligence would understand that this language reaches uses of an aircraft done in preparation for or incident to the flight of an aircraft.