[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11984

_____

ORGANIZATION OF PROFESSIONAL AVICULTURISTS, INC.,
LINEOLATED PARAKEET SOCIETY,

Plaintiffs-Appellants,

*versus*

U.S. FISH AND WILDLIFE SERVICE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-23536-KMW

_____

Before ROSENBAUM, ABUDU, and TJOFLAT, Circuit Judges.

ROSENBAUM, Circuit Judge:

As it turns out, a bird in the hand is not worth as much as two in the bush. At least, that's what Congress decided when it enacted the Wild Exotic Bird Conservation Act of 1992 ("Act"), 16 U.S.C. § 4901 *et seq.*, and protected birds in the bush (the wild) by limiting when they can be in the hand (domestically imported). To promote exotic-bird conservation, the Act prohibits the importation of certain exotic bird species into the United States. *See* 16 U.S.C. §§ 4902, 4904. But a person may petition to add a species to a list of those approved for import, so long as the species meets certain criteria. *Id.* §§ 4905, 4909.

Plaintiffs ("Aviculturists") are organizations that represent "aviculturists," people who care for or breed birds. The Aviculturists sought to import two captive-bred species of parrots, the Cactus conure and the green form of the Lineolated parakeet, from certain European countries. But the Act prohibits those species' importation.

So the Aviculturists petitioned the United States Fish and Wildlife Service ("Service") to add the two parrot species to the list of species approved for import under the Act. There was a small catch, though. Rather than petitioning the Service to add these two parrot species as a whole to the list, the Aviculturists petitioned to add the species, but only those members of the species that have been captive-bred *in certain European countries*.

The Service denied the Aviculturists' petitions as invalid. It said that the Act's implementing regulations didn't allow the Service to approve species in a country-by-country manner.

The Aviculturists sued, contending that the Service must add captive-bred species to the exemption list on a country-by-country basis under the Act. Because the Service rejected the Aviculturists' petitions asking it to do just that, the Aviculturists asserted, the Service's determination that the Aviculturists' petitions were invalid violated both the Act and Sections 706(1) and 706(2) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

The district court dismissed the Aviculturists' claims with prejudice. It reasoned that the text of the Act instructs the Service to consider the addition of different "species" as a whole to the list of approved species, rather than the addition of a species from particular countries. And the district court found that this reading aligned with both the agency's own decades-old interpretation and the statute's other sections, which list the substantive criteria for adding species to the approved list.

We agree that the plain text and structure of the Act instruct the Service to consider adding "species" of exotic birds, as a whole, to the list of species approved for importation. So we affirm the district court court's judgment.

4                    Opinion of the Court                    23-11984

## I.    BACKGROUND

### A.  Statutory Framework

Because our analysis focuses on the Act, we begin with a discussion of the Act's purpose, text, and structure.

Congress's purpose in enacting the Wild Exotic Bird Conservation Act is easy enough to discern.  After all, Congress said what its purpose was in the legislative findings it made within the Act.  Those findings show that Congress passed the Act because it concluded that "the international pet trade in wild-caught exotic birds is contributing to the decline of species in the wild . . . ."  16 U.S.C. § 4901(1).  And Congress sought to "ensur[e] that the market in the United States for exotic birds does not operate to the detriment of the survival of species in the wild."  *Id.* § 4901(2).  To accomplish its goal, the Act sets forth "measures that are necessary for the conservation of exotic birds," limiting the species that can be lawfully imported into the United States.  *Id.* § 4901(14).

Among other things, the Act aims to support implementation of the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 ("CITES Treaty" or the "Convention"), to which the United States is a signatory.  *See* 16 U.S.C. §§ 4901, 4904.  The CITES Treaty is an agreement among 183 countries and the European Union to strictly regulate the trade of species to avoid the threat of extinction.  CITES Treaty art. II; *see also* https://www.fws.gov/international-affairs/cites [https://perma.cc/G5DQ-Y2VS] (listing the current number of

parties to the treaty).  To promote the goal of the CITES Treaty, the Act recognizes that Congress can "adopt stricter domestic measures for the regulation of trade in all species" than the CITES Treaty does, but the CITES Treaty sets the floor.  16 U.S.C. § 4901(12) (citing CITES Treaty art. XIV).

The CITES Treaty maintains three Appendices that list different species, which are subject to different regulations.  *See* CITES Treaty art. II.  The parties agree that both species at issue—Cactus conure and green-form Lineolated parakeet—appear in Appendix II to the CITES Treaty.[1]  Because both species appear in an Appendix to the CITES Treaty, they are subject to the Act.

---

[1] Appendix II includes "(a) all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation . . . ; and (b) other species which must be subject to regulation in order that trade in specimens of certain species . . . may be brought under effective control."  CITES Treaty art. II.  Congress expressed concern that species listed in Appendix II were especially vulnerable before the Act's moratorium.  A House Report explained, "In many cases there is evidence that the existing level of trade is resulting in declines in wild populations of certain species, but the evidence is insufficient to list birds on Appendix I. As a result, the birds are traded in very large numbers (while they are listed on Appendix II) until their numbers dwindle to the point that they are endangered enough to warrant an Appendix I listing."  H.R. Rep. No. 102-749, pt. 1, at 9 (1992).  Not only that, but Congress expressed specific concern about species of parrots like the ones at issue.  *See id.* at 8.  It noted that birds in this order made up half of the "hundreds of thousands of live birds" imported into the United States each year, while finches made up the other half.  *Id.* at 8–9.  And it said that parrots, relative to finches, are "less prolific breeders, and the health of their populations is more greatly impacted by harvest from the wild for the pet trade."  *Id.*

For its part, the Act establishes a moratorium on "the importation of any exotic bird of a species that is listed in any Appendix to the Convention . . . unless the Secretary [of the Interior] makes the findings described in section 4905(c) of this title and includes the species in the list published under section 4905(a) of this title."[2] 16 U.S.C. § 4904(c). The list published under subsection 4905(a), in turn, includes "species of exotic birds that are listed in an Appendix to the Convention and that are not subject to a prohibition or suspension of importation otherwise applicable . . . ." *Id.* § 4905(a)(1). In other words, species on the list published under subsection 4905(a) can be imported, even though they appear in an Appendix.

Zooming out to Section 4905 as a whole, that section addresses how the Secretary must decide whether to list a species for importation. Under the header "Bases of determinations," Section 4905 requires the Secretary to, among other things, account for how "all countries of origin" regulate and enforce against illegal trade in the species. The statute provides, *"In making a determination* required under this subsection, the Secretary shall—(A) use the best scientific information available; and (B) consider the adequacy of regulatory and enforcement mechanisms in *all countries of origin*

---

[2] The term "Secretary" in the Act means the Secretary of the Interior or his designee. 16 U.S.C. § 4903(6). The Secretary of the Interior has designated the Service to act for it under the Act. *See, e.g.*, Importation of Exotic Wild Birds to the United States, 58 Fed. Reg. 60524, 60529 (November 16, 1993) (codified at 50 C.F.R. pt. 15).

for the species, including such mechanisms for control of illegal trade." *Id.* § 4905(a)(3) (emphases added).

Section 4905 also instructs the Secretary on how he must list species that he approves for importation. Under the header "Manner of listing," Section 4905 requires the Secretary to "*list a species under paragraph* [(a)](1) [for inclusion on the importation list] with respect to—(A) the countries of origin from which the species may be imported; and (B) if appropriate, the qualifying facilities in those countries from which the species may be imported." *Id.* § 4905(a)(2) (emphasis added).

Then Section 4905 identifies the criteria that the Secretary must assess in determining whether to include captive-bred species and non-captive-bred species, respectively, on the exemptions list. *Id.* § 4905(b)–(c). For captive-bred species, like the two kinds of parrots the Aviculturists petitioned to add to the list here, the Act requires the Secretary to "include a species of exotic birds in the list . . . if the Secretary determines that" the species meets one of two qualifications: "(1) the species is regularly bred in captivity and no wild-caught birds of the species are in trade; or (2) the species is bred in a qualifying facility." *Id.* § 4905(b).[3]

---

[3] For non-captive-bred species, the Secretary must "include in the list" of approved species certain Appendix-listed species of exotic birds if he "finds the Convention is being effectively implemented with respect to that species because" four factors are met. *Id.* § 4905(c). First, "[e]ach country of origin for which the species is listed [must be] effectively implementing the Convention . . . ." *Id.* Second, "[a] scientifically-based management plan for the species [must] ha[ve] been developed" that "provides for the conservation of the

Now that we've reviewed the Secretary's role in determining what species to exempt from the moratorium and how to list those species, we focus on Section 4909. That part of the Act describes the mechanism for a person to seek to add, modify, or abolish a moratorium, quota, or exemption on importing a bird species. It allows "[a]ny person [to] at any time submit to the Secretary a petition in writing requesting that the Secretary . . . establish, modify, or terminate any prohibition, suspension, or quota under this chapter on importation of any species of exotic bird . . . [or] add a species of exotic bird to, or remove such a species from, a list under section 4905 of this title . . . ." *Id.* § 4909(a).

When a person submits such a petition, within 90 days, the Secretary must "issue and publish in the Federal Register a preliminary ruling regarding whether the petition presents sufficient information indicating that the action requested in the petition might be warranted." *Id.* § 4909(b)(1). If the Secretary determines that a petition might have merit, the Secretary must provide an opportunity for public comment, and then he must issue and publish a final ruling on the petition. *Id.* § 4909(b)(2).

Title 50, part 15, of the Code of Federal Regulations sets forth the Act's implementing regulations. Those regulations list

---

species," ensures that its use "is biologically sustainable and maintained throughout the range of the species in the country to which the plan applies," and "addresses factors relevant to the conservation of the species . . . ." *Id.* Third, that plan must be "implemented and enforced." *Id.* And fourth, "[t]he methods of capture, transport, and maintenance of the species [must] minimize[] the risk of injury or damage to health . . . ." *Id.*

the species of exotic birds that the Service has determined are exempt from the importation prohibition. *See* 50 C.F.R. § 15.33 (2017). Section 15.31 describes the "[c]riteria for including species in the approved list for captive-bred species," and Section 15.32 does so for non-captive-bred species. *Id.* §§ 15.31–15.32. To add a captive-bred species (like the parrots the Aviculturists sought to add) to the exemptions list, the Secretary must make four findings:

> (a) *All* specimens of the species known to be in trade (legal or illegal) are captive-bred;
>
> (b) *No* specimens of the species are known to be removed from the wild for commercial purposes;
>
> (c) Any importation of specimens of the species would not be detrimental to the survival of *the species in the wild*; and
>
> (d) Adequate enforcement controls are in place to ensure compliance with paragraphs (a) through (c) of this section.

*Id.* § 15.31 (emphases added). By their nature, these findings require the Secretary to consider the species's status in all countries. *See id.*

### B. Facts and Procedural History

In the summer of 2021, the Aviculturists filed petitions to add captive-bred Cactus conures and green-form Lineated parakeets "from Certain European Countries to the List of Approved Species under 16 U.S.C. § 4905." We refer to these two specific petitions as the "Petitions." The Petitions explained that both species are "regularly bred in captivity in Europe," and that "no wild-

caught birds of the species are in the relevant European trade." Based on these assertions, the Aviculturists sought to add to the exemptions list captive-bred Cactus conures and green-form Line-olated parakeets from specified European countries "[p]ursuant to 16 U.S.C. § 4905(b) . . . ."

The Service denied both Petitions as invalid. It said that "the [Act] and our implementing regulations do not allow for inclusion of species in the approved list for captive-bred species in such a country-by-country manner." In explaining its decision, the Service cited the final rule that the Secretary promulgated to implement the Act. During that rule-making process, the Service noted, the agency received some comments "that species should be listed on the approved list of captive-bred species, *on a country-by-country basis*, if they are reliably bred in captivity in a specific country only." Importation of Exotic Wild Birds to the United States, 59 Fed. Reg. 62255, 62257 (December 2, 1994) (codified at 50 C.F.R. pt. 15) (emphasis added). But "[t]he Service disagree[d] and [made] no changes based on these comments." *Id.*

Rather, the Service, reasoned, *"The [Act] does not provide for species listings in such a country-by-country manner."* *Id.* (emphasis added). Only "the qualifying overseas breeding facilities can be listed by the country from which the species is to be imported," the Service said. *Id.*

At bottom, the Service informed the Aviculturists that it would "take no further action" on the Petitions, declining to publish a preliminary ruling on their merits. Still, the Service reminded

the Aviculturists that they could file new petitions in a non-country-specific manner if they had "sufficient information" that each species "as a whole meets the criteria" listed in 50 C.F.R. § 15.31.

Taking the Service up on this, the Aviculturists filed new petitions, for both species, "without conceding the appropriateness" of the denials of their first-filed Petitions. These attempts fared little better than their first ones. The Service announced 90-day rulings on both of the second-filed petitions. Analyzing the species as a whole (and not just the species in the countries the Aviculturists designated), the Service found that the second-filed petitions did "not present sufficient information" to warrant the addition of either species to the exemptions list. So the Service declined to take further action. Those second-filed petitions are not at issue here, so we discuss them no further.

Rather, the Aviculturists filed suit, challenging the Service's denials of only the first two Petitions. The Aviculturists alleged that (1) the Service "'unlawfully withheld' and 'unreasonably delayed'" action to grant their Petitions, in violation of Section 706(1) of the APA (Count I); and (2) the Service's denials of the Aviculturists' Petitions were "arbitrary, capricious, and [an] abuse of discretion, and contrary to law," in violation of Section 706(2) of the APA (Count II). To remedy these alleged violations, the Aviculturists sought declarations that the denials violated federal law and an order requiring the Service to publish preliminary 90-day findings on the Petitions.

The Service moved to dismiss the complaint, and the district court granted the motion with prejudice.  First, the court explained that the Aviculturists have standing—even though the second-filed petitions were substantively denied—because the specific relief the Aviculturists sought was not a favorable ruling, but a published ruling.

Second, the court held that subsection 4905(a)(2) of the Act unambiguously "requires petitions to list captive-bred exotic bird species on a species-wide basis."  As a result, the court reasoned, the Aviculturists' Petitions "were invalid under the [Act] and [the Service's] implementing regulations."  And so the court found that the Service was not required to publish a ruling on the Petitions because it had correctly determined that the Petitions were invalid.  Based on these conclusions, the court concluded that the Aviculturists failed to state a claim in Count I.

Third, for roughly the same reasons, the court held that the Aviculturists also failed to show that the Service's denials of the Petitions were arbitrary, capricious, an abuse of discretion, or otherwise unlawful (Count II).  So the court dismissed Count II.  The court alternatively dismissed Count II on the grounds that, if construed as a facial challenge of the 1994 implementing regulation we've described, the claim is also time barred.

The Aviculturists now appeal.

## II.        STANDARD OF REVIEW

We review questions of statutory interpretation de novo. *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018).

## III.        DISCUSSION

The Aviculturists argue that subsection 4905(a)(2)'s text unambiguously requires the Service to list exotic birds approved for import on a country-by-country basis.  Based on that text, the Aviculturists assert that the Service necessarily must "accept and adjudicate country-specific petitions."

We disagree.  The text, structure, and purpose of the Act all demand the conclusion that the Act requires the Service to determine whether to exempt a "species" as a whole—not just members of the species that hail from certain countries—from the Act's importation moratorium.[4]

> A.    *The text and structure of the Act require the Secretary to add species as a whole to the list approving them for importation.*

We begin with the text and structure of the Act.  *See People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1146 (11th Cir. 2018) (per curiam).  And when a "statute's meaning is plain and unambiguous," we also end there.  *Id.* (quoting *United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002)) (internal quotation marks omitted).  In "deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *King v.*

---

[4] The Service contends that the Aviculturists forfeited any challenge to the district court's ruling on Count I and to its alternative timeliness ruling on Count II.  We need not address the Service's forfeiture argument because the arguments fail on the merits, in any case.

*Burwell*, 576 U.S. 473, 486 (2015) (citation omitted). "Our duty, after all, is 'to construe statutes, not isolated provisions.'" *Id.* (citation omitted).

With this guidance in mind, we turn to the Act to determine whether, as the Aviculturists assert, it requires the Secretary to decide whether a species qualifies on a country-by-country basis for exemption from the moratorium. We conclude that it does not.

> 1. The text directs the Secretary to consider approving species as a whole for importation.

The Act's text requires us to first consider the meaning of "species." After all, the Act prohibits "the importation of any exotic bird of a species that is listed in any Appendix to the Convention . . . unless the Secretary makes the findings described in section 4905(c) of this title and *includes the **species** in the list* published under section 4905(a) of this title." 16 U.S.C. § 4904(c) (emphases added). In the same way, the list that subsection 4905(a) anticipates includes only "***species*** of exotic birds that are listed in an Appendix to the Convention and that are not subject to a prohibition or suspension of importation otherwise applicable . . . ." *Id.* § 4905(a)(1) (emphasis added).

Conveniently enough, the Act defines "species." Less conveniently, the Act's definition requires further exploration. Under the Act, "species" means "any species, subspecies, or any distinct population segment of a species or subspecies; and . . . includes hybrids of any species or subspecies." *Id.* § 4903(7). As relevant here,

23-11984                Opinion of the Court                15

this definition requires us to consider, in turn, the ordinary meaning of "species" and the meanings of "subspecies" and "distinct population segment of a species or subspecies."

We start with "species." Because the Act's definition of "species" uses the word "species" to define "species," we must consider the "ordinary, contemporary, and common meaning" of "species." *See Drazen v. Pinto*, 106 F.4th 1302, 1343 (11th Cir. 2024) (en banc) (cleaned up). That means "we look to the plain meaning of ['species'] as it was understood at the time the law was enacted." *Id.* (citation omitted).

Because Congress enacted the Act in 1992, we turn to dictionaries from that period. *See id.* ("[O]ne of the ways to figure out [the] meaning [of 'statutory language as it was understood at the time the law was enacted'] is by looking at dictionaries around the time of enactment.") (citation omitted). At the time, dictionaries defined "species" as a class of animals that share common traits or characteristics and can interbreed. None defined species by reference to the countries that they hail from.

For instance, the OXFORD ENGLISH DICTIONARY defined "species," in the zoological or botanical context, as "[a] group or class of animals or plants (usually constituting a subdivision of a genus) having certain common and permanent characteristics which clearly distinguish it from other groups." *Species*, OXFORD ENGLISH DICTIONARY (2d ed. 1989). WEBSTER'S NEW WORLD DICTIONARY likewise defined biological "species" as "a naturally existing population of similar organisms that usually interbreed only

among themselves, and are given a unique, latinized binomial name to distinguish them from all other creatures." *Species*, WEBSTER'S NEW WORLD DICTIONARY (3d ed. 1988). And the CONCISE AMERICAN HERITAGE DICTIONARY defined "species" as "[a] fundamental category of taxonomic classification consisting of organisms capable of interbreeding," or "[a]n organism belonging to such a category," or, more generally, "[a] kind, variety, or type." *Species*, CONCISE AMERICAN HERITAGE DICTIONARY (rev. ed. 1987).[5] Similarly, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defined biological "species" as follows:

> [(1)] a category of biological classification ranking immediately below a genus or subgenus and being denominated in taxonomic usage by a binomial that consists of the name of its genus followed by a Latin [word that] . . . agrees grammatically with the genus name: a group of intimately related and physically similar organisms that actually or potentially interbreed and are less commonly capable of fertile interbreeding with members of other groups, that ordinarily comprise differentiated populations limited geographically (as subspecies) or ecologically (as ecotypes) which tend to intergrade at points of contact, and that as a group represent

---

[5] Other dictionaries from the period defined "species" as a more general term, not specific to the animal kingdom. For example, BLACK'S LAW DICTIONARY defined "species" as "[i]n the civil law, form; figure; fashion or shape. A form or shape given to materials." *Species*, BLACK'S LAW DICTIONARY (6th ed. 1990). These types of definitions, which do not address the subject matter of the Act, are not instructive here, and we do not discuss them further.

the stage of evolution at which variations become fixed . . . [or]

[(2)] an individual plant or animal or a kind [thereof] belonging to a particular species . . . .

*Species*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1986).[6]

Even this last definition from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, which observed that species "ordinarily comprise differentiated populations limited geographically (as subspecies)" does not define species—or for that matter, subspecies—by reference to particular countries of origin. Put simply, the ordinary meaning of "species" does not support the Aviculturists' interpretation that the Act requires the Secretary to decide whether a species qualifies for exemption from the moratorium on a country-by-country basis. That's so because a species may (and often does) exist over more than a single country, even if it may have some general geographic limitations. *See id.* So a country-by-country assessment, under the common meaning of "species," violates Congress's directive that the Secretary determine qualification on a "species" basis.

That brings us to the meaning of "subspecies." But that definition doesn't help the Aviculturists any more than the definition

_____

[6] Compared to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, we can see why the CONCISE AMERICAN HERITAGE DICTIONARY, whose definition of "species" we just reviewed, refers to itself as "concise."

18                    Opinion of the Court                    23-11984

of "species." It, too, declines to classify animals based exclusively on country of origin. WEBSTER'S NEW WORLD DICTIONARY defines "subspecies" as "any natural subdivision of a species that exhibits small, but persistent, morphological variations from other subdivisions of the same species living in different geographical regions or times: the subspecies['] name is usually the third term . . . in a trinomial . . . ." *Subspecies*, WEBSTER'S NEW WORLD DICTIONARY (3d ed. 1988). Again, the reference to general geographical or regional boundaries does not mandate the interpretation that "subspecies," by definition, are confined to particular countries. The ordinary meaning of "subspecies," like "species," doesn't support the Aviculturists' interpretation of the Act.

That leaves the phrase "distinct population segment of a species or subspecies." 16 U.S.C. § 4903(7)(A). But the Aviculturists forfeited any argument that they sought to add only a "distinct population segment" to the importation list. Their Petitions requested to add the Cactus conures and green-form Lineolated parakeets to the exemptions list as "species," not as "distinct population segments" of those species. Nor in the district-court proceedings did the Aviculturists so much as suggest that their Petitions sought to add only a "distinct population segment," rather than a species as a whole, to the importation list. The Aviculturists also didn't make the argument in their opening brief in this Court. In fact, their opening brief said that "a species does refer to all genetically related individuals worldwide . . . ." In short, the Aviculturists forfeited this argument. *See United States v. Campbell*, 26 F.4th 860, 871 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022) ("Typically, issues not raised

in the initial brief on appeal are deemed abandoned."). So we do not consider now whether the Service could add a distinct population segment country by country.[7]

In sum, the Act authorizes the Secretary to add birds to the list by "species," and birds do not qualify as "species" under the Act simply because they are in one country versus another.

> 2. <u>The Act's structure also shows that the Secretary cannot approve species on a country-by-country basis.</u>

But we don't stop with the definition of "species." Rather, we turn next to the structure of the Act. At least seven features of the Act's structure show that the Service cannot determine, on a country-by-country basis, whether to authorize the importation of a species.

---

[7] That said, we are doubtful that it could. That term—"distinct population segment"—is not one in common parlance. But it has taken on a certain meaning under the Endangered Species Act, Pub. L. No. 95-632, § 2(5), 92 Stat. 3751, 3752 (1978), which uses the same phrase when it defines "species." And "[w]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). In the case of the Endangered Species Act, the Secretary adopted a policy defining "distinct population segment." *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("Policy"), 61 Fed. Reg. 4722, 4722 (February 7, 1996). Under the Policy, it seems clear that these parrot populations can't qualify as "distinct population segments" simply because they happen to exist in one set of countries versus another.

First, subsection 4904(c) prohibits the importation "of any exotic bird of a species that is listed in any" CITES Appendix "unless the Secretary makes the findings described in section 4905(c) . . . and includes the *species* in the list published under section 4905(a)[.]" 16 U.S.C. § 4904(c) (emphasis added). By its terms, this subsection imposes a moratorium at the "species" level. It does not refer to countries.

Second, subsections of the Act speak in terms of "species," without qualifications for specific countries. For instance, subsection 4905(a)(1) requires the Secretary to publish "a list of *species* of exotic birds . . . ." 16 U.S.C. § 4905(a)(1). Similarly, subsections 4905(b) and (c) state requirements for determining whether to "include a *species* of exotic birds" on the list. *Id*. § 4905(b)–(c) (emphasis added).

Third, in determining whether to allow importation of a species, the Act requires consideration of "the best scientific information available." *Id*. § 4905(a)(3). Country borders aren't "scientific information."

Fourth, in determining whether to allow importation of a species, the Act also requires the Secretary to consider "the adequacy of regulatory and enforcement mechanisms *in all countries of origin for the species*, including such mechanisms for control of illegal trade." *Id*. (emphasis added). In other words, the Secretary may not limit its consideration of the adequacy of regulatory and enforcement mechanisms to those in only certain countries of origin for the species. It must consider those factors as they pertain to

every country of origin in the world. And it would make little sense for Congress to require the Secretary to consider the adequacy of regulatory and enforcement mechanisms "in all countries of origin for the species" if the Secretary could grant a petition for exemption on a country-by-country basis. *Cf. Carachuri-Rosendo v. Holder*, 560 U.S. 563, 573 (2010) (stating that statutory interpretation involves examining not only the statute's terms, but also "the 'commonsense conception' of those terms").

Fifth, subsection 4905(b)'s criteria for including a "species of exotic birds in the list" preclude the possibility that the Service can decide on a country-by-country basis. To include a captive-bred species, the Service must determine either that "the species is regularly bred in captivity and no wild-caught birds of the species are in trade; or . . . the species is bred in a qualifying facility." 16 U.S.C. § 4905(b). As subsection 4905(b) employs the phrase "regularly bred in captivity," that phrase is a relative one that requires consideration of the universe of how a species globally—not just in a particular country—reproduces. As for the phrase "no wild-caught birds of the species are in trade," that requires the Service to assess whether even a single wild-caught bird is in trade, anywhere in the world—not just in a given country.

We know this not simply because of the text that appears in subsection 4905(b). But comparing that text to the other way in which the Secretary may add a species to the list—if "the species is bred in a qualifying facility"—shows that Congress knew how to limit the Secretary's consideration to a smaller universe of a species

when it wanted to do so. That's so because to be a "qualifying facility," a facility must meet the criteria that subsection 4906(b)(6) sets out. *Id.* § 4906. And those criteria require assessing information about the particular country in which the facility is located. *Id.* § 4906(b)(4) ("The appropriate governmental authority of the *country* in which the facility is located has certified in writing, and the Secretary is satisfied, that the facility has the capability of breeding the species in captivity.") (emphasis added); *id.* § 4906(b)(5) ("The *country* in which the facility is located is a Party to the Convention.") (emphasis added). This discrete, country-level analysis differs from the global analysis that subsection 4905(a) contemplates.

We think it's telling that Congress chose to (1) authorize imports based on narrower categories than the species as a whole and (2) require consideration of country-specific information in determining whether to add a captive-bred species to the list—but Congress did so only for facilities, not with respect to countries.[8] "Where Congress knows how to say something but chooses not to, its silence is controlling." *Animal Legal Def. Fund. v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) (citation omitted).

---

[8] Similarly, the criteria that the Secretary considers in determining whether to add a *non*-captive-bred species to the importation list include assessing discrete countries of origin. *See supra* n.4 (citing 16 U.S.C. § 4905(c)). The same is not true for captive-bred species under the Act. *Compare* 16 U.S.C. § 4905(c) *with id.* § 4905(b).

Sixth, Section 4907 also shows that Congress knew how to limit consideration to a particular country if it wanted to. Section 4907 deals with exotic birds that aren't listed in any Appendix to the CITES Treaty. As relevant here, that section does two things. First, it authorizes the Secretary to establish a moratorium or quota on the importation of "any species of exotic birds *from one or more countries of origin* for the species" under certain conditions. 16 U.S.C. § 4907(a)(2)(A) (emphasis added). And second, it authorizes the Secretary to establish a moratorium or quota on the importation of all species of exotic birds *from a particular country*" in some cases. *Id.* § 4907(a)(2)(B) (emphasis added).

Once again, Congress's use of country-specific phrases shows that Congress knew how to mandate country-specific determinations under the Act when it wanted to do so. But conspicuously absent from Section 4905 is any such reference when it comes to the requirements of adding captive-bred species for importation.

And seventh, the Aviculturists filed their Petitions under subsection 4909(a)(2). That provision allows petitions to "add a *species* of exotic bird to, or remove such a *species* from, a list under section 4905 of this title . . . ." *Id.* § 4909(a)(2) (emphases added). It doesn't authorize petitions for species from particular countries of origin.

We think these features of the text and structure of the Act require the conclusion that Congress authorized the Secretary to determine whether to exempt birds from the importation

moratorium on a species-by-species basis, not on a country-by-country basis.

Not only that, but the Secretary reached this same conclusion way back in 1994, when the Secretary issued the final rule implementing the Act. At that time, the Secretary said that the agency had received some comments "that species should be listed on the approved list of captive-bred species, *on a country-by-country basis*, if they are reliably bred in captivity in a specific country only." Importation of Exotic Wild Birds to the United States, 59 Fed. Reg. 62255, 62257 (December 2, 1994) (codified at 50 C.F.R. pt. 15) (emphasis added). The Service disagreed. *Id*. It explained its understanding that "*[t]he statute does not provide for species listings in such a country-by-country manner*. However, the qualifying overseas breeding facilities can be listed by the country from which the species is to be imported." *Id*. (emphasis added).

Under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), we find the Secretary's consistent interpretation persuasive for three reasons. First, the Secretary issued this explanation soon after Congress enacted the Act. And the Supreme Court has instructed that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id*. at 2262. Second, the Service has consistently applied the understanding that the final rule conveyed thirty years ago. *See id*. And third and most importantly, for the reasons we've already stated, we

independently think the text and structure of the Act require the same conclusion that the Secretary reached.

For all these reasons, we conclude that the Act does not authorize the Secretary to consider exempting from the importation ban a species on a country-by-country basis, as the Aviculturists' Petitions asked the Service to do.

### 3. The Aviculturists' counterarguments do not persuade us.

The Aviculturists' efforts to convince us otherwise fail to persuade us. The Aviculturists make four arguments. We address each in turn.

First, the Aviculturists look to the text of Section 4905. They argue that the district court's (and our) interpretation would render the manner-of-listing provision "surplusage." We disagree. And the title of the heading helps explain why. *See Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[The Supreme] Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citations and internal quotation marks omitted)). The "manner of listing" provision of Section 4905(a)(2) dictates just that—how the Secretary must *list* an approved species, *after* the Secretary has determined the species is substantively approved under Section 4905(b) or Section 4905(c).

Simply put, the direction in Section 4905(a)(2) that the Secretary "shall *list* a species" on the importation list with respect to discrete countries of origin means what it says. 16 U.S.C.

§ 4905(a)(2) (emphasis added).  And the following subsection, entitled the "Bases for determinations," means what it says: *"[i]n making a determination*," the Secretary shall consider "the best scientific information" and "regulatory and enforcement mechanisms *in all countries of origin* for the species . . . ."  *Id.* § 4905(a)(3) (emphases added).  The substantive determinations the Service must consider in adding a species to the importation list differ from the technical requirements the Secretary must abide by in listing a given species.  Construing these two requirements as Congress wrote them leaves no surplusage.

Second, the Aviculturists contend that because the Act's definition of "species" includes subspecies, distinct population segments, and hybrids, the Act's text "explicitly accepts[] the idea that species may be subdivided," and one such form of "subdivision" is on a country-by-country basis.  But the mere fact that the Act contemplates some forms of divisibility does not mean that it authorizes every form of divisibility.  In fact, the contrary is true.  That Congress chose to permit specific forms of divisibility suggests that it did not approve of forms of divisibility outside the ones it expressly authorized.  *Cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) ("We construe [the statute's] silence as exactly that:  silence.")  And by its terms, the Act does not contemplate subdividing captive-bred species *on a country-by-country basis* in Section 4905.

Third, the Aviculturists expand on this "subdivision" argument by pointing to the Act's use of the term "distinct population

segment." The Aviculturists argue that this term supports their interpretation because "a [distinct population segment] is an amorphous category" that, in the Endangered Species Act context, involves considering a given species's international boundaries. This, too, is unpersuasive.

As we've explained, the Aviculturists did not petition to add the parrots as "distinct population segments," so we have no reason to reach the question of what doing so might hypothetically require under the Act. And even if distinct-population-segment determinations in the Endangered Species Act context involve some assessment of international boundaries, that does not mean that we define a distinct population segment—nor a species—by reference to international boundaries alone.

In fact, the examples the Aviculturists cite underscore that international boundaries are only one among many factors the Service might account for in determining what counts as a "distinct population segment" in the Endangered Species Act context. *See, e.g.*, 78 Fed. Reg. 38162-01, 38172 (June 25, 2013) (codified at 15 C.F.R. pt. 17) (finding that distinct population segments of the broad-snouted caiman existed in Argentina and elsewhere because of the "significant differences in the management of habitat, conservation status, exploitation, and regulatory mechanisms between . . . Argentina and the species in the rest of its range," and clarifying that the two population segments "are clearly defined by international governmental boundaries *and these other differences*" (emphasis added)); 67 Fed. Reg. 35942-01, 35955 (May 22, 2002) (codified

at 15 C.F.R. pt. 17) (finding that populations in specified countries "satisfy the discreteness criterion because they are sovereign nations with defined international boundaries *that have implemented national laws to control exploitation and conserve habitats*" (emphasis added)).

Fourth, the Aviculturists argue that the meaning of "country of origin," as it appears in regulations implementing the CITES Treaty, supports their interpretation. We disagree. The Aviculturists point to subsection 4905(a)(2)'s reference to "countries of origin." Then they contend that two regulations require the conclusion that we must construe that phrase to mean that the Service may determine whether to exempt a species on a country-by-country basis. More specifically, the Aviculturists cite two regulations that define "country of origin" as, respectively, "the country where the wildlife or plant was taken from the wild or was born or propagated in a controlled environment," 50 C.F.R. § 23.5, and "the country where the animal was taken from the wild, or the country of natal origin of the animal," 50 C.F.R. § 10.12.

We don't see how that moves the needle here. As we've explained, Section 4905(a)(3) tells the Service how to determine whether to include a "species" for exemption. For its part, Section 4905(a)(2) pertains to only listing after the Service makes "species" determinations. Not only that, but Section 4905(a)(2) provides that "the Secretary shall list a species with respect to" "the countries of origin *from which the species may be imported*." 16 U.S.C. § 4905(a)(2) (emphasis added). So again, the substantive criteria for addition to

23-11984                Opinion of the Court                29

the list require the Secretary to consider "species" as a whole. In other words, the key question is not what "countries of origin" means, but what "species" means. And at the risk of parroting ourselves once again, "species" means "species."

In short, the Aviculturists' reading would undermine the plain language of the statute. The Act specifies countries of origin as a substantive consideration when Congress wished for the Secretary to consider countries of origin and does not do so when Congress thought countries of origin irrelevant.[9] The statute's plain language directs the Secretary to make the relevant substantive determinations about whether to exempt a species from the moratorium through a global assessment of captive-bred species's characteristics. *See* 16 U.S.C. § 4905.

In sum, we think the Act cannot sustain the Aviculturists' proposed interpretation.

> B.    *The purpose of the Act supports the conclusion that the Act authorizes consideration of exemption on a species level rather than a country level.*

---

[9] *Compare* 16 U.S.C. § 4905(b) (not listing countries of origin among the criteria for consideration for whether to include captive-bred species on the exemption list) *with id*. § 4905(c) (directing the Secretary to consider whether "*[e]ach country of origin* . . . is effectively implementing the Convention," and whether a "scientifically-based management plan . . . has been developed which . . . ensures that the use of the species is biologically sustainable and maintained throughout the range of the species *in the country to which the plan applies*," among other factors, for non-captive-bred species (emphases added)).

Because "the statute's meaning is plain and unambiguous," we need not proceed. *Miami Seaquarium*, 879 F.3d at 1146 (quoting *Fisher*, 289 F.3d at 1338) (internal quotation marks omitted). But we think it's worth noting that the interpretation we set forth is also in line with the stated purpose of the Act: "to promote the conservation of exotic birds." 16 U.S.C. § 4902. The statute seeks to achieve this, in part, by "ensuring that *all* trade in species of exotic birds involving the United States is . . . not detrimental to the species," *id.* § 4902(2) (emphasis added), and by "prohibiting imports of exotic birds when necessary to ensure that . . . wild exotic bird populations are not harmed by removal of exotic birds from the wild for the trade," *id.* § 4902(3).

Congress was particularly concerned about this goal when it comes to parrots. As a House Report explained, "the health of [parrot] populations is most threatened by the [global pet] trade," requiring protections like the moratorium on importation. *See* H.R. Rep. No. 102-749, pt. 1, at 9 (1992). And in passing the Act, Congress found that the United States, "as the world's largest importer of exotic birds" like these parrots, "should play a substantial role" in protecting them in the wild. 16 U.S.C. § 4901(2).

Congress sought to effect this goal, in part, by limiting the birds that the Service may approve for domestic import. *See id.* § 4901(3). But the Aviculturists' reading of the statute would instead *expand* the importation list and risk domestically importing

23-11984                Opinion of the Court                31

wild-caught birds misrepresented as captively bred.[10]  This would risk the exploitation of wild bird populations, rather than their conservation; and so it contradicts the purpose of the Wild Exotic Bird Conservation Act.

In this way, not only the text mandates the interpretation that Section 4905 contemplates analyzing captive-bred bird species for approval on a global basis.  The Act's stated goals of promoting the conservation of exotic birds in the wild also well align with the text's plain meaning.

***

In sum, the Act does not permit the Secretary to consider exempting a species from the moratorium on a country-by-country basis.  So the Service did not "unlawfully withh[o]ld" or "unreasonably delay" action when it denied the Aviculturists' Petitions, and the Service's denials of the Petitions were not "arbitrary, capricious, and [an] abuse of discretion, [nor] contrary to law."  So the Service's denials of the Petitions did not violate the APA.

---

[10] The 1994 final rule implementing the Act observes that when Congress passed the Act, it "recognized that there are serious concerns that wild-caught birds are often intentionally misrepresented as captive-bred.  For this reason, the law specifies criteria for the import of captive-bred species; it does not simply exempt them."  59 Fed. Reg. at 62257.  It also notes that "the Service is aware of illegal trade whereby wild-caught birds are misrepresented as captive-bred and laundered as captive-bred birds."  *Id*.  Reading limitations *out* of the statute, as the Aviculturists ask us to do, would heighten this risk and contradict the Act's purpose as Sections 4901 and 4902 state it.

## IV.    CONCLUSION

For these reasons, we affirm the judgment of the district court dismissing the Aviculturists' case.

**AFFIRMED.**